IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RONALD LANTON, et al., | : | |
| Plaintiffs, | | |
| v. | : | Case No. 3:15-cv-372 |
| OCWEN LOAN SERVICING, LLC., et al., | | JUDGE WALTER H. RICE |
| Defendants. | : | |

_____

DECISION AND ENTRY OVERRULING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; DOC. #95; AND SUSTAINING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT, DOC. #97

_____

This matter is before the Court pursuant to a Motion for Summary Judgment filed by Defendants, Ocwen Loan Servicing, LLC ("Ocwen"), and U.S. Bank, N.A., as Trustee for the C-BASS Mortgage Loan Asset Backed Certificates, Series 2007-RPI ("U.S. Bank") (collectively "Defendants"), Doc. #95, and a Motion for Partial Summary Judgment filed by Plaintiffs, Ronald Lanton ("Mr. Lanton") and Cynthia Lanton ("Mrs. Lanton") (collectively "Plaintiffs" or "the Lantons"). Doc. #97. Defendants filed a Supplemental Briefing on the RESPA Issue, Doc. #123, and Plaintiffs filed Supplemental Briefing in Support of Plaintiffs' Motion for [Partial] Summary Judgment. Doc. #124. Both parties filed replies. Doc. ##126 and 127. Pursuant to the Court's Decision and Entry, Doc. #159, Defendants and Plaintiffs

have also filed supplemental briefing and replies concerning the Notice of Error in Plaintiffs' Qualified Written Request of August 3, 2015. Docs. ##160–63.

The motions are ripe for decision.

## I. Procedural Background

The Lantons' Third Amended Complaint alleged claims against their loan servicer, Ocwen, and against U.S. Bank, as its principal, for violations under the Real Estate Settlement Procedures Act of 1974 ("RESPA"), 12 U.S.C. § 2601, et seq. (First Count), the Fair Credit Reporting Act of 1970 ("FCRA"), 15 U.S.C. § 1681, et seq. (Third Count)[1] and the Fair Debt Collection Practices Act of 1977 ("FDCPA"), 15 U.S.C. § 1692, et seq. (Fourth Count). Doc. #42. The Lantons also alleged a state law claim for breach of contract against Ocwen and U.S. Bank, the holder of their promissory note and mortgage on their home (Fifth Count). *Id*. After the discovery period, Defendants filed a Motion for Summary Judgment, Doc. #95, and Plaintiffs filed a Motion for Partial Summary Judgment on the issue of liability only. Doc. #97. The Court's Decision and Entry ("Decision"), Doc. #116, held that Defendants were entitled to judgment as a matter of law for any alleged violations of FCRA, FDCPA and RESPA. The Court dismissed the RESPA claim based on Mrs. Lanton's deposition testimony and her failure to articulate any "actual consumer damages." *Id*. at PageID #1763. In the absence of any remaining federal claim, the

_____

[1] The Second Count of the Third Amended Complaint asserted that Equifax Information Services, LLC ("Equifax"), violated the FCRA. This Defendant was later dismissed with prejudice and is not a party to these motions. Doc. ##72 and 73.

Court declined to exercise supplemental jurisdiction over the state law claim for breach of contract and dismissed it without prejudice to refiling in state court. Doc. #116 at PageID #1764. The Lantons subsequently filed an appeal.

The Sixth Circuit Court of Appeals affirmed the dismissal of the FCRA and FDCPA claims but reversed the Court as to the lack of any violation under RESPA. *Lanton v. Ocwen Loan Servicing, LLC*, 793 F. App'x 398 (6th Cir. 2019). The Appellate Court held that "the [D]istrict [C]ourt erred by making Ms. Lanton's statement from her deposition regarding actual damages dispositive on the issue" and instructed the Court "to consider the entirety of the record in determining whether the Lantons' RESPA claim survives summary judgment." *Id*., at 402. It concluded by stating that if the RESPA claim survives summary judgment, this Court should exercise supplemental jurisdiction over the breach of contract claim. *Id*.

Following the Circuit Court's ruling, the parties filed supplemental material on the RESPA issue. Doc. ##123–24, 126–27. Then, after a two-year lapse in proceedings during the COVID-19 pandemic, the Court directed the parties to submit written memoranda on the issue of the Notice of Error ("NOE") in Plaintiffs' Qualified Written Request of August 3, 2015. Doc. #132. What followed next was an extended and jumbled series of filings and orders directly arising from the untimely deaths of the Lantons in mid-litigation,[2] which the Court addressed in the previous Decision and Entry. Doc. #159 at PageID ##2218–21. After disentangling the

---

[2] Based on the Suggestion of Death on the Record, Doc. #135, Plaintiff Cynthia Layton died on February 7, 2022, and Plaintiff Ronald Layton died on September 4, 2022.

myriad issues, motions, and related filings, the Court verified the Lantons' RESPA claim survived their deaths, *id.* at PageID ##2223–24, granted the substitution of the Lantons' estates, *id.* at PageID ##2226, and vacated any filings or findings following the Suggestion of Death, Doc. #135, that addressed the dueling motions for summary judgment and partial summary judgment and directed the parties to rebrief the RESPA claim and NOE issue. *Id.* at PageID ##2228. The parties submitted their supplemental memoranda, Doc. ##160 & 161, as well as their replies. Doc. ##162 & 163.

For the reasons set forth below, the Court OVERRULES Defendants' Motion for Summary Judgment, Doc. #95, and SUSTAINS Plaintiffs' Motion for Partial Summary Judgment. Doc. #97.

## II. Factual Background[3][4]

### a. Litton as Servicer of Note & Mortgage on Plaintiffs' Residence: February 2000

In early September 1998, Plaintiffs refinanced their home in Xenia, Ohio, and their promissory note and mortgage were assigned to U.S. Bank. The refinancing did not require or authorize escrow amounts for payments of real estate taxes and

---

[3] Following this Court's Decision, Doc. #116, a foreclosure proceeding was filed in the Common Pleas Court of Greene County, Ohio, *U.S. Bank National Association v. Cynthia L. Lanton and Ronald W. Lanton, et al*, Case No. 2019 CV 0086. Plaintiffs assert this case resulted in the discovery of "additional certified documents" from the Lantons' Chapter 13 Bankruptcy which better explain Plaintiffs' payments to Ocwen for the "escrow issues." Doc. #124 at PageID #1806. To the extent these documents are relevant, they are referenced herein.

[4] The Court's now-vacated order, Doc. #140, previously laid out the facts of the case. Because those facts remain unchanged, the Court restates those facts in their entirety herein.

4

insurance. Doc. #95-1 PageID #957–61. In February of 2000, Litton Mortgage Servicing Center, Inc. ("Litton"), began servicing the Lantons' note and mortgage. Doc. #97, PageID #1097–98 (citing Doc. #97-1, PageID #1114).

On February 10, 2000, Mr. Lanton filed for relief under Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Ohio. Doc. #124-1, PageID #1829. He received a discharge on August 7, 2003. Doc. #124-2, PageID #1840. The Greene County Treasurer filed a proof of claim for real estate taxes in the amount of $895.00 which was paid by the Chapter 13 Trustee. Doc. #124-1, PageID #1827.

### b. Mrs. Lanton's Chapter 13 Bankruptcy: 2002-2007

On February 8, 2002, Mrs. Lanton filed for relief under Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Ohio. Litton, on behalf of U.S. Bank, filed a proof of claim for "Total Arrearages" in the amount of $10,000.86. The "detail of arrearages" included $5,904.34 for mortgage payments from January 14, 2001, through January 14, 2002, $1,276.97 for an "Escrow Shortage" and other fees and charges. Doc. #124-5, PageID #1855. Mrs. Lanton objected to the proof of claim, argued that Mr. Lanton had paid part of the debt to U.S. Bank in his bankruptcy and asserted she only owed $6,058.11 for the arrearages. Doc. #124-7.[5] On June 28, 2005, the Bankruptcy Court reduced the claim to the amount requested by Mrs. Lanton. A proof of claim

_____

[5] There is no information as to what the "arrearages" of $6,058.11 were for or how they were calculated.

5

filed by the Greene County Treasurer in the amount of $3,630.94 for real estate taxes was disallowed in its entirety by the Bankruptcy Court. Doc. #124-9, PageID #1881.

While she was under bankruptcy protection and pursuant to her approved plan, the Chapter 13 Bankruptcy Trustee made payments to U.S. Bank for Mrs. Lanton's mortgage in the amount of $29,067.52 and also for the $6,058.11 proof of claim filed by Litton on behalf of U.S. Bank for the arrearages. Doc. #124-6, PageID ##1859, 1865–1867.

On May 11, 2007, shortly before Mrs. Lanton received her discharge from bankruptcy, the Chapter 13 Trustee filed a motion, requesting that the Bankruptcy Court order U.S. Bank to adjust its real estate mortgage. Doc. ##124-10 and 124-12. On June 6, 2007, the Bankruptcy Court issued an order that Mrs. Lanton should make her real estate mortgage payment to U.S. Bank beginning July 2007. Doc. #124-11. The order further stated "U.S. Bank shall show upon its books and records" that Mrs. Lanton "has paid all arrearages, interests, costs, expenses and claims set forth in the original and any amended proof of claim filed by U.S. Bank in this case" and that her "real estate mortgage is current" through June 2007. *Id*.

## c. Litton's 2008 "Escrow Advance Balance," Plaintiffs' May 29, 2008, QWR and Litton's Response

On April 18, 2008, approximately one year after Mrs. Lanton's Chapter 13 discharge, Litton sent Plaintiffs a letter that said they owed an "escrow advance balance" in the amount of $11,536.99. Doc. #97-1, PageID #1138. The letter

6

further stated that beginning June 14, 2008, their mortgage payment would be increased to \$591.53 per month for 84 months. *Id*. On May 29, 2008, Mrs. Lanton's bankruptcy counsel sent a letter to Litton and stated it was a "qualified written request" ("QWR") under RESPA. Doc. #95-1, PageID #973–74. The QWR sought specific pre-and post-bankruptcy information including a "breakdown of the current escrow payment." *Id*. On May 31, 2008, Mrs. Lanton sent an email to the Litton website and requested information that explained why the monthly amount was increasing. Doc. #95-1, PageID #976. Litton responded to Mrs. Lanton's email by sending three separate letters, all dated June 2, 2008, to Plaintiffs. *Id*., PageID ##976, 979–80.

The first June 2, 2008, letter from Litton was addressed to Mrs. Lanton and stated the payment of taxes was the responsibility of the "Customer," and that between December 16, 2002, and November 29, 2006, it received four separate notifications of delinquent Greene County, Ohio, real estate taxes. Litton stated it paid these taxes on Plaintiffs' behalf. Doc. #95-1, PageID #976. The second June 2, 2008, letter was addressed to Mr. Lanton and stated "[A]n escrow account has not been established for the future payment of property taxes," and that if Plaintiffs pay these taxes, they should provide Litton with either receipts or copies of cancelled checks. Doc. #95-1, PageID #979. The third Litton letter of June 2, 2008, was also sent to Mr. Lanton and repeated that an "escrow advance balance" of \$11,536.99 for taxes existed and stated, for the first-time, that the amount included "lenders placed insurance." Doc. #95-1, PageID #980.

7

On June 18, 2008, Mrs. Lanton sent an email to the Litton website, requesting copies of documents sent by Litton to her bankruptcy attorney. *See* Doc. #95-1, PageID #984. On June 20, 2008, Litton responded and stated it had mailed her attorney "[C]opies of the Detail Transaction History" and would also send these to her. *Id.*

On August 1, 2008, Litton responded to the QWR sent by Mrs. Lanton's bankruptcy attorney. *Id*. at PageID #986. It stated, among other things, that "effective June 14, 2008, an escrow payment of $137.35 was added to Plaintiffs['] monthly principal and interest payment for a total monthly payment of $591.53." *Id*. It asserted that the additional amount was the result of "an escrow advance balance of $11,536.99 subsequent to" Mrs. Lanton's bankruptcy discharge and was "spread over 84 months." *Id*. The August 1, 2008, letter stated that there were "no outstanding corporate advances"[6] before or after Mrs. Lanton's Chapter 13 filing on February 8, 2002. *Id*., PageID #986–987. With the letter, Litton enclosed a Payment Audit from March 21, 2000, to the present (August 1, 2008), and an "Escrow Account Transaction." *Id*.[7]

---

[6] Corporate advances include, among other things, foreclosure expenses, late charges, non-sufficient funds ("NSF") check charges, appraisal fees, property inspection, preservation fees, legal fees, bankruptcy/proof of claim and other expenses and costs. Doc. #95-1, PageID #987.

[7] The enclosures to the August 1, 2008, letter, "Payment Audit and Escrow Account Transactions" were not included as exhibits.

8

### d. 2009-2014: Ocwen's September 1, 2011, Acquisition of Litton and a "New Escrow Payment" of $1,932.37

On November 3 and 4, 2009, Plaintiffs contacted Litton via its website[8] and requested "a complete summary of our account," and information concerning the Greene County real estate taxes. The communication further stated that Mr. Lanton "went to the tax office today only to find that Litton. . . has paid the taxes." Doc. #95-1, PageID ##989, 991–92. They also requested the name of a contact at U.S. Bank. *Id*. On November 6 and 9, 2009, Litton responded to Plaintiffs. It stated it would send them a copy of the "Detail Transaction History" and that the Lantons should send a copy of the "formal payment plan with the county tax office." It declined to provide contact information for U.S. Bank. Doc. #95-1, PageID ##989, 991–992 and 994–995.

On April 29, 2010, Litton responded to a letter sent by Nancy Woodruff ("Woodruff") of the Ohio Attorney General's Office on behalf of the Lantons. *Id*. at PageID #996. It stated it paid real estate taxes to Greene County in 2002, 2004, 2006 and 2009, "waived all attorney fees and costs on the account for any bankruptcy and foreclosure proceedings" and that there "were no outstanding fees, costs, or late charges." *Id*.

On September 1, 2011, Ocwen acquired Litton and—as stated in an affidavit by Ocwen's Senior Loan Analyst, Howard R. Handville ("Handville")—Plaintiffs' loan

---

[8] Plaintiffs' inquiries to Litton sent via its websites were not included as exhibits.

was current and due for the September 14, 2011, payment. Doc. #95-1, PageID #951.

Sometime in 2014, Mrs. Lanton and Blue Ocean[9] were denied small business loans, allegedly because an Equifax credit report incorrectly stated she "was under Chapter 7 bankruptcy protection." Doc. #42, PageID #458. On March 18, 2014, Equifax informed Mrs. Lanton that Ocwen had furnished the bankruptcy information to Equifax and it had verified its accuracy. *Id*., PageID #466. Equifax did not remove or modify the information on the credit report and, allegedly, Mrs. Lanton and Blue Ocean "were forced to turn down several lucrative contracts." *Id.*, PageID #459.

Although Mr. and Mrs. Lanton maintained that the increased fees were improperly assessed, Doc. #97-1, PageID #1116, they continued to make monthly payments on the loan.

On December 5, 2014, Ocwen sent a letter to Plaintiffs stating they were required to make timely property tax and insurance payments and that if those are not paid, Ocwen may have to pay them. Doc. #95-1, PageID #998. It further stated "a recent audit of your loan shows that an advance of $1,932.37 will appear" in the "Past Due" section of the billing statement and that, beginning February 14, 2015, Plaintiffs' monthly mortgage payment will increase by $161.03. *Id.* The letter also stated this "new escrow payment does NOT represent the establishment of an

---

[9] Although the Third Amended Complaint, Doc. #42, named Mrs. Lanton's company, Blue Ocean Ambulette Services, LLC ("Blue Ocean"), as a Plaintiff, it was dismissed from the Second Amended Complaint pursuant to this Court's Decision and Entry and is not a party to Plaintiff's Motion for Partial Summary Judgment. Doc. ##38 and 97.

10

escrow account; it is only for the repayment of the advance shown above," and that Plaintiffs were still responsible for paying property taxes and insurance as they become due. (emphasis in original). *Id.* On December 12, 2014, Ocwen's Office of the Consumer Ombudsman ("Ocwen Ombudsman") responded to an attorney for Plaintiffs concerning their credit reporting data and provided them with "a copy of Ocwen's history." Doc. #95, PageID #1001.

### e. The April 16, 2015, and June 16, 2015, Letters to Plaintiffs from Ocwen's Office of the Consumer Ombudsman

On April 16, 2015, Ocwen's Ombudsman sent a letter to Mr. Lanton and stated it was in response to "your recent correspondence."[10] Doc. #95-1, PageID ##1004–24. The letter explained that on December 4, 2014, it completed "an audit" of the "2008 negative escrow balance" to see "if the previously established negative escrow advance repayment plan" could be repaid in full "at the end of the stated repayment agreement." *Id.*, PageID #1004. Because Ocwen determined that repayment could not be achieved "in the remaining seven months of the established escrow advance repayment plan," it increased the monthly payment an additional $161.03 so that the $1,932.37 negative balance could be repaid over twelve months. *Id.*, PageID #1005. The letter also stated "[Y]our correspondence further referenced a remitted payment was misapplied toward possible Bankruptcy attorney and corporate advance adjustments." Ocwen responded to this alleged

---

[10] The Court does not have a copy of any correspondence from either Mr. or Mrs. Lanton.

misapplication of the Lanton's payment by stating the "payment history did not reflect any assessed Bankruptcy attorney fees and/or corporate advance adjustments after the account's acquisition." (emphasis added). It further stated that the payment history, which it stated was enclosed, reflected "all credits and disbursements made to the loan by Ocwen." *Id*. The letter from Ocwen indicated that the "Note, Mortgage, Litton Advance Corporate Arrangement Letter, Escrow Advance Notice and Payment History" were enclosed. *Id*., PageID #1006.[11]

Two months later, on June 16, 2015, Ocwen's Ombudsman sent another letter to Plaintiffs, this one directed to Mrs. Lanton, stating it was in response to "your recent correspondence"[12] and "a telephone conversation" that occurred on June 8, 2015. Doc. #95-1, PageID #1026. According to Ocwen's letter, Mrs. Lanton claimed that "Litton had misapplied mortgage payments either to the suspense account or to [B]ankruptcy attorney fees and costs" and not "solely to the mortgage payments and/or the 2008 escrow advance repayment plan payments." *Id*., PageID #1026. Ocwen explained that a "suspense account is a non-interest[-]bearing account and is a means to apply funds to a loan, but not yet distribut[ed] . . . to a particular obligation." *Id*. The letter further stated that Mrs. Lanton claimed Litton "submitted an inaccurate proof of claim" in her bankruptcy "which reflected [that] Litton's Bankruptcy fees and costs were paid when[,] in fact[,] they had been absorbed during

---

[11] The affidavit of Ocwen's corporate representative included a copy of the Note and Mortgage. Doc. #95-1, PageID ##1007–24. Mrs. Lanton included as an attachment to her affidavit the Litton "partial payment history" sent by Ocwen in April 2014." Doc. #97-1, PageID ##1116, 1139–77.

[12] *See*, n. 10.

12

said bankruptcy, resulting in an inaccurate unpaid principal balance." *Id*. Ocwen asserted that it responded to these concerns in its April 16, 2015, letter. It further stated that "[p]ursuant to your recent concerns, our Office completed a more detailed review of Litton's records." *Id*. According to Ocwen's response, Mrs. Lanton's bankruptcy was completed before Ocwen began servicing the account, but their "review of the payment history" showed "all the payments received by Litton and Ocwen were applied to the loan as per the payment posting logic" and "because there are no outstanding fees on the account," Ocwen did not use any portion to pay corporate advances. The June 16, 2015, letter also explained that the "audit" referenced in the December 5, 2014, letter sent to the Lantons concerned the "escrow advance repayment plan payments." *Id*., PageID ##1027–28. Ocwen's Ombudsman stated that "[C]urrently, the account is past due for the April 14, 2015[,] contractual payment." The June 16, 2015, letter concluded by stating:

Ocwen has investigated your allegation and found no evidence that an error was made. I have enclosed the documentation we relied upon to review your concern. If you believe there is additional documentation relevant to your issue, which was not provided, you may request such documents by contacting me directly.

*Id*., PageID #1027–28. The letter included an Ocwen contact name and telephone number. *Id*.[13]

---

[13] The June 16, 2015, letter stated that enclosures included the "April 16, 2015, letter, Note and Payment History."

13

### f. Plaintiff's August 3, 2015, Qualified Written Request and Ocwen's Response

On August 3, 2015, an attorney for the Lantons sent Ocwen a "qualified written request for information ('QWR') and notice of error" pursuant to RESPA, 12 U.S.C. § 2605(e). Doc. #95-1, PageID ##1030–31. The letter contained a section entitled "Notice of Error" ("NOE"), cited 12 C.F.R. § 1024.35, and a second section entitled "Request for Information" ("RFI") and citing 12 C.F.R. § 1024.36. *Id*. The QWR specifically referenced the actions of both Litton and Ocwen.

Under the NOE section, the QWR stated that Litton: (1) submitted an inaccurate proof of claim in Mrs. Lanton's bankruptcy by alleging 13 missed payments from January 14, 2001, through January 14, 2002; (2) failed to credit properly payments to principal and interest made on the arrearage under [Mrs. Lanton's Chapter 13] plan and improperly assessed fees and charges; and (3) required the Lantons, following Mrs. Lanton's bankruptcy discharge, to enter into an agreement to pay an "alleged escrow shortage that was for corporate advances." *Id*. The NOE also asserted that both Litton and Ocwen improperly assessed charges and fees as part of the escrow shortage and failed to credit the escrow account. *Id*. The NOE section of the QWR stated "the Lantons dispute all late fees, charges, inspection fees, property appraisal fees, forced placed insurance charges, legal fees, and corporate advances charged to the account." *Id.*

Under the RFI section, the QWR requested 16 different items including "information about the fees, servicing, costs, and escrow accounting of this loan[.]"

14

*Id*., PageID #1131. The request for information also included a complete payment history of payments and charges, an accounting of payments applied during Mrs. Lanton's Chapter 13 bankruptcy and an accounting of all escrow shortages. *Id*.

On or about August 12, 2015, Ocwen acknowledged its receipt of the QWR, Doc. #95-1, PageID #1039, and on August 14, 2015, it informed Plaintiffs' counsel that it would direct all future correspondence to counsel, but that Ocwen could not respond to their request for information about the origination of the loan, as it was not involved in it. *Id.*, PageID. #1049. Ocwen also stated it is "obligated to service the loan in accordance with the terms of the Note and Mortgage signed by the borrower(s). A review of the Note indicates that the borrower's [sic] have signed it and [are] responsible for the debt. As such, the above loan is valid." *Id*. Ocwen further advised Plaintiffs' counsel that it would provide loan documents to them and had submitted a request for the "Transaction History" of the Plaintiffs' loan which would be sent to counsel under separate cover along with the reinstatement and payoff quotes and other documents regarding the loan. *Id*., PageID #1050–51. The letter included a description of the transaction codes used in the Transaction History. *Id*., PageID #1050. Ocwen also stated that "as a result of the payment delinquency, fees were incurred by Ocwen that were then assessed to the loan for repayment" and these "were assessed in accordance with the terms and conditions of the Mortgage and Note" and are included in the Transaction History. *Id*., PageID #1051.

Also, on August 12, 2015, Ocwen provided a copy of the loan payment history from August 2011, the month before it began servicing the loan, through

15

August 4, 2015. *Id*., PageID #1192–95. It did not include a payment history from when the loan was being serviced by Litton.

Mrs. Lanton testified in her deposition that she incurred damages in the form of an "exceptionally high mortgage balance," "interest that has accrued with the misapplied or non-applied payments" and "the denial of the loan or loans for the purchase of the ambulette."[14] Doc. #98, PageID ##1282 and 1307.

## III. Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; see also *Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd*., 61 F.3d 1241, 1245 (6th Cir. 1995); see also *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary

---

[14] *See*, n. 8.

judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id*. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the factfinder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998). In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record

17

for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990). If it so chooses, however, the Court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

## IV.    Legal Analysis

### a.   RESPA

RESPA is intended to provide more information to home buyers and sellers of their settlement costs, as well as to curb "'abusive practices in the real estate settlement process.'" *Martini v. JPMorgan Chase Bank, N.A.*, 634 F. App'x 159, 163 (6th Cir. 2015) (quoting *Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419, 424 (6th Cir. 2013). So, as RESPA is a remedial consumer protection statute that applies to the negotiation and execution of mortgage contracts and loan servicing, *see Marais v. Chase Home Finance LLC*, 736 F.3d 711, 719 (6th Cir. 2013) (citing *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665–66 (9th Cir. 2012)), the Court will construe it broadly "to effectuate its purposes." *Marais*, 736 F.3d at 719.

Generally, a RESPA claim starts when the borrower submits a "qualified written request" or "QWR" to the loan servicer and requests "information relating to the servicing" of the loan. 12 U.S.C. § 2605(e)(1)(A).[15] Once the QWR is received,

---

[15] A QWR is defined in 12 U.S.C. § 2605(e)(1)(B) and states, in general, that it must be "written correspondence" that permits a servicer to identify the borrower's name and account and "includes a statement of the reasons" why the borrower believes the servicer is in error or "gives sufficient detail" of "other information sought by the borrower." *Id*.

the servicer has a window of five (5) business days to provide the borrower with acknowledgement, 12 U.S.C. § 2605(e)(1)(A)), and the servicer must provide a substantive response to that QWR within thirty (30) business days. 12 U.S.C. § 2605(e)(2).

The parties agree the August 3, 2015, letter sent to Ocwen constitutes a QWR, and that Ocwen responded to it in a timely fashion. However, the Lantons argue that, because the QWR contained two different sections—an NOE and an RFI— that Ocwen was required to respond substantively to each.

A servicer provides a substantive response to an NOE in one of two ways. One is to "make appropriate corrections" and notify the borrower. 12 U.S.C. § 2605(a); 12 C.F.R. § 1024.35(e)(1)(i)(A). The other is to conduct a "reasonable investigation," give the borrower written notification that no error has occurred, include a statement of the reason(s) for this determination, inform the borrower of their right to request documents the servicer relied upon in reaching that determination, provide information regarding how the borrower can request such documents and give contact information, including a telephone number, for further assistance. 12 U.S.C. § 2605(e)(2)(B); 12 C.F.R. § 1024.35(e)(1)(i)(B).

Similarly, to respond to an RFI, a servicer must either: (a) provide the requested information and contact information, including a telephone number "for further assistance in writing;" or (b) conduct a "reasonable search" for the information, give the borrower written notification explaining why the servicer

19

determined the information is unavailable, and give contact information and a telephone number for further assistance. 12 C.F.R. § 1024.36(d)(1).

There are, however, three situations where a servicer does not need to respond to an NOE: (1) if the servicer determines the NOE is duplicative of an error that the servicer previously addressed; (2) if the NOE is overbroad and the servicer cannot determine the specific error being asserted; or (3) the NOE is untimely. 12 C.F.R. § 1024.35(g)(1). Likewise, a servicer is not required to respond to an RFI if the information requested is duplicative, confidential, proprietary, privileged, irrelevant, overbroad, unduly burdensome, or untimely. 12 C.F.R. § 1024.36(f)(1). Once the servicer has determined that one or more of these reasons applies and the NOE or RFI does not require a substantive response, it "shall notify the borrower of its determination in writing not later than five days. . . after making its determination" and "the notice "shall set forth the basis. . .upon which the servicer has made such determination." 12 C.F.R. §§ 1024.35(g)(2) and 1024.36(f)(2).

### b. Ocwen's Response to Plaintiffs' NOE

The NOE in Plaintiffs' August 3, 2015, QWR asserted, in general, that Litton filed an inaccurate proof of claim in Mrs. Lanton's bankruptcy for thirteen (13) missed payments from January 14, 2001, through January 14, 2002. The Lantons further maintained that Litton had improperly credited their payments on the arrearage, had assessed improper fees and charges, and had required them to enter into an "alleged escrow shortage that was for corporate advances." The NOE also asserted that both Litton and Ocwen improperly assessed charges and fees as part

20

of the escrow shortage and failed to credit the escrow account. Doc. #95-1, PageID #1030. Plaintiffs' RFI in its August 3, 2015, QWR listed sixteen (16) separate requests for information. *Id*., PageID #1031. Several of these requests consisted of multiple documents.

Ocwen contends that its letters, dated August 12–14, 2015, responded to Plaintiffs' NOE and RFI. Their letters consisted of an acknowledgement of the QWR and separate letters of the payoff and reinstatement amounts, transaction codes and payments it received beginning in September 2011, with each payment allocated to specific categories such as principal, interest, late fees, and escrow. Ocwen further contends that these "same issues [were] previously investigated on December 12, 2014, April 16, 2015[,] and June 16, 2015," that many of the information requests were "unduly burdensome requests," and that some were not appropriate RESPA requests. Doc.#95, PageID #929; Doc. #163, PageID #263; Doc.#95-1, PageID ##1039–1090.

The Court finds that Ocwen's letters, dated August 12–14, 2015, failed to properly respond to the Lantons' NOE. Therefore, because Ocwen did not correct the asserted errors, it was required to conduct a "reasonable investigation." 12 U.S.C. § 2605(e)(2)(C)(i); 12 C.F.R. § 1024.35(e)(1)(i)(B). Ocwen argues that because its August 14, 2015, letter to Plaintiffs states "we have reviewed the loan and below is the recap" that this is an investigation. *See* Doc. #95-1, PageID #1049. The Court does not agree. Handville, Ocwen's corporate representative, testified that Ocwen conducted no investigation that he knew of, and that Ocwen did not

21

specifically respond to any of the NOE's allegations of misapplied payments, improperly credited payments to principal and interest, or to the escrow arrearages. Doc. #93-1, PageID ##781–84. Further, Handville testified that he was unsure if Ocwen responded to any of the issues in the NOE, and that Ocwen's response appeared to him to be a "generated letter" taken from a template. *Id.*, PageID #791.

Even assuming Ocwen conducted a "reasonable investigation" as required by 12 C.F.R. § 1024.35(e)(1)(i)(B), it failed to provide the Lantons with the requisite written notification (1) that no error occurred, (2) what Ocwen's basis was for this determination, (3) that the Lantons' had a right to request documents Ocwen relied upon in reaching this determination, and (4) contact information for how the Lantons could request those documents. *Id*.

Ocwen also argues that the August 12–15, 2015, letters did not need to comply with § 1024.35(e)(1)(i)(B), since it investigated these "same [NOE] issues" on December 12, 2014, April 16, 2015, and June 16, 2015. Accordingly, it asserts it was not required to respond to the August 3, 2015, QWR letter since it was duplicative. Doc. #138, PageID #2238. The Court does not agree. Although the December 12, 2014, response enclosed the "Litton Loan Servicing (LLS) history," the remainder of the letter concerned issues reported to the "four major credit agencies." Doc. # 95-1, PageID #1001. Neither the April 16, 2015, letter nor the June 16, 2015, letter addressed the allegedly inaccurate proof of claim for thirteen (13) missed payments from January 2001 to January 2002 made under Mrs. Lanton's Chapter 13 plan, nor did they address the allegedly improperly assessed

fees and charges. Although Ocwen stated it made no "corporate advances," it did not address whether Litton did so.

Finally, even if these letters could somehow be construed as "a duplicative notice of error" pursuant to 12 C.F.R. § 1024.36(g)(i), Ocwen still failed to give the Lantons regulation-required written notice of this. Section 1024.35(g)(2) states that the "servicer shall notify the borrower" of its determination that the request is duplicative within five days after making the determination. *Id.* (emphasis added). None the letters made this affirmative assertion that the NOE was duplicative.

Accordingly, the Court finds that Ocwen failed to comply with 12 C.F.R. §§ 1024.35(e)(1) and § 1024.35(g)(2).

### c. Plaintiffs' RFI and Ocwen's Response

Plaintiffs' RFI in the August 3, 2015, QWR letter lists sixteen (16) separate requests for information. Doc. #95-1, PageID #1031. Ocwen asserts its "QWR responses included the information requested, an explanation regarding the reason some information was not included and provided contact information if Plaintiff had any further concerns." Doc. #123, PageID #1793. Clearly, Ocwen sent considerable information to Plaintiffs in response to their RFI, although it did not provide a separate and complete accounting of all payments made during Mrs. Lanton's Chapter 13 bankruptcy or a detailed itemization of all escrow shortages. Additionally, Ocwen did not provide a "complete payment history" which would have included records for Litton as Plaintiffs requested in the RFI. Moreover, although Ocwen correctly argued that some of the information requested was duplicative of information previously

sent by Litton and was overbroad or unduly burdensome, Ocwen failed to comply with the notice requirements for responding to an RFI pursuant to 12 C.F.R. § 1024.36(f)(2). This section states the "servicer shall notify the borrower" of its determination within five days after making the determination and that "[t]he notice to the borrower shall set forth the basis" for the determination. *Id*. (emphasis added).

Accordingly, the Court finds that Defendant failed to comply with 12 C.F.R. §§ 1024.36(d)(1) and § 1024.36(f)(2).

#### d. Damages under RESPA

To recover for a violation of RESPA, Plaintiffs must show "actual damages" as a result of Ocwen's failure to comply with RESPA and "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." 12 U.S.C. § 2605(f). REPSA does not define the term "actual damages," *see* 12 U.S.C. § 2602 (listing definitions), and there is no evidence presented of a "pattern or practice." Thus, the Court is left to consider whether Mrs. Lanton's deposition testimony, which consisted of her statements that she was damaged as a result of paying on an "exceptionally high mortgage balance" and "the interest that has accrued with the misapplied or non-applied payments," Doc. #98, PageID #1274, constitutes "actual damages" under RESPA.

The Lantons argue this testimony, coupled with the cost incurred by Plaintiffs for the preparation of the QWR, is enough to establish "actual damages" under RESPA. *See Marais*, 736 F.3d at 721 (the cost of preparing a QWR that is

24

inadequately responded may constitute actual damages). In response, Ocwen argues that a motion for summary judgment requires evidence of the "actual damages" that flow from a RESPA violation and not vague testimony of a higher mortgage balance, the accrual of interest from unspecified misapplied payments or the cost of preparing a QWR with no causal connection to the cost and the alleged RESPA violation. It cites in support *Jester v. CitiMortgage*, No. 1:13-CV-1926, 2014 WL 5091712, at \*4 (N.D. Ohio Oct. 9, 2014) (citing 12 U.S.C. § 2605(f)(1)(A)).

However, in *Justice v. Ocwen Loan Servicing*, No. 2:13-cv-165, 2015 2015 WL 235738, \*19 (S.D. Ohio Jan. 16, 2015) (Sargus, J.) (internal quotations omitted), the Court considered the issue of "actual damages" in a motion for summary judgment as to liability only. The Court held that "actual damages" existed in the preparation of a QWR and interpreted "actual damages as encompassing 'all expenses, costs, fees, and injuries fairly attributable to [the servicer's] failure to respond appropriately to the QWR, even if incurred before the failure to respond.'" *Id*., (quoting *Marais v. Chase Home Fin., LLC*, No. 2:11–CV–314, 2014 WL 2515474, at \*13 (S.D. Ohio June 4, 2014) (Smith, J.)). The Court noted that, because the motion for summary judgment was as to liability only, it held that that damages for the RESPA violation could be determined at trial.

Like *Justice*, Plaintiffs have filed a Motion for Summary Judgment as to liability only, and, as stated in this Decision, the Court has found violations of RESPA. As a remedial statute, the Court construes RESPA broadly and finds that actual damages can be determined at trial.

25

Accordingly, the Court sustains Plaintiffs' Motion for Partial Summary Judgment on the issue of liability as to RESPA, Doc. #97, and overrules Defendants' Motion for Summary Judgment. Doc. #95.

### e. Breach of Contract

Defendants also moved for summary judgment on the Lantons' claim for breach of contract. *See* Doc. #95, PageID #941–43. The parties agree that a contract existed with Bank One for the Mortgage Loan and Promissory Note with the bank. They also agree that Ocwen, as the servicer, acted as Bank One's agent. However, Defendants assert that the Lantons breached the contract by failing to pay property taxes and make timely payments. *Id.*, PageID #944. They contend this breach is evidenced by the fact that Plaintiffs' account was in default at the time this action was filed on October 12, 2015. *Id.* In response, the Lantons argue that they "substantially performed" the contract and that two separate sections of the Mortgage Loan required U.S. Bank to give the Lantons notice for any escrow advances prior to their having to reimburse it. Doc. #124, PageID ##1818. They further assert that a jury could reasonably find that Plaintiffs would have paid any alleged escrow advance for property taxes had U.S. Bank provided such notice. *Id.* at PageID #1818–19. Plaintiffs further contend that Defendants breached the Mortgage Loan and Promissory Note through their alleged misapplication of payments and charging of improper fees and expenses. *Id.* at PageID #1820–23. They further assert that based on the two bankruptcies, the issue of any alleged failure to pay the real estate taxes was a good faith dispute. *Id.* at PageID #1819.

To establish a claim for breach of contract, Plaintiff must show a binding contract or agreement, that they performed their contractual obligations and suffered damages due to Defendants' breach of that contract or agreement. *Lucarell v. Nationwide Mut. Ins. Co*., 152 Ohio St. 3d 453, 469, 2018-Ohio-15, 97 N.E.3d 458 (Ohio 2018). Whether a binding contract or agreement exists is a question of law. *Latina v. Woodpath Development Co.,* 57 Ohio St.3d 212, 214, 567 N.E.2d 262 (1991); *Stock Yards v. Hillsboro*, 191 Ohio App.3d 564, 569 at ¶ 10, 947 N.E.2d 183, 186 (Ohio Ct. App. 2010). The party asserting the existence of a contract has the burden of proof. *Guardian Alarm Co. v. Portentoso*, 196 Ohio App.3d 313, 963 N.E.2d 225, 230 (2011) (citations omitted). Under Ohio law, the statute of limitations for Plaintiffs' breach of contract claim is eight years after the cause of action accrued. Ohio Revised Code § 2305.06. Accordingly, any claim the Lantons may have for a breach of contract against Defendants is barred prior to October 12, 2007.

Based on the evidence before the Court, genuine issues of material fact exist with regard to actions of the Defendant within the eight-year period of the statute of limitations. These include, at a minimum (1) whether Defendants were in breach of the contract for misapplication of payments to principal and interest and charging of fees and expenses; (2) whether Plaintiffs substantially performed under the contract due to Bank One's alleged failure to give the Lantons notice for escrow advances made for real estate taxes.

Accordingly, the Court finds that there are genuine issues of material fact. Defendants' Motion for Summary Judgment on Plaintiffs' Fifth Count for Breach of Contract is overruled.

## V.    Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment as to Plaintiffs' claim under RESPA and breach of contract is OVERRULED. Doc. #95. If not settled, trial will go forward on Plaintiff's claims for damages under RESPA and for liability and possible damages under Plaintiffs' Breach of Contract Claim.

Plaintiffs' Motion for Partial Summary Judgment as to the issue of liability of Defendants under RESPA is SUSTAINED. Doc. #97.

Counsel will take note that a scheduling conference call will take place, beginning at 4:00 p.m. on Wednesday, May 22, 2024. Feeling that this matter is in a state where settlement talks may prove fruitful, this Court will not require a Rule 26(f) filing prior to the conference call. If the results of the above scheduling conference do not support the Court's premises as to settlement, a further conference will be scheduled with the requirement that a Rule 26(f) filing be accomplished 48 hours prior to the second conference call.

Date: May 7, 2024

WALTER H. RICE
UNITED STATES DISTRICT JUDGE

28